United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Seminole Tribe Of Florida, Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| State Of Florida, Department Of Revenue, and Marshall Stranburg, as Interim Executive Director and Deputy Executive Director, Defendants | ) Civil Action No. 12-62140-Civ-Scola ) ) ) ) ) |

## **Order On Cross Motions For Summary Judgment**

The Seminole Tribe of Florida filed this lawsuit challenging the imposition of two Florida taxes: the Rental Tax and the Utility Tax. After considering the extensive briefing by the parties, as well as hearing oral argument from each side, the Court finds that Federal law prohibits both taxes from being imposed.

### **1. Background**

The Seminole Tribe of Florida is a federally recognized Indian tribe, with reservations throughout Florida. The Florida Department of Revenue is the agency responsible for collecting tax revenues and enforcing Florida's tax laws. Marshall Stranburg is the executive director of the Department of Revenue.

The Seminole Tribe owns and operates entertainment and gaming facilities, including the Seminole Hard Rock Hotel and Casinos, at its Hollywood Reservation and its Tampa Reservation. (*Compare* Compl. ¶10, ECF No. 1 *with* Answer ¶10, ECF No. 52.) As part of these operations, the Tribe has leased a portion of the space at the Seminole Hollywood Casino to Ark Hollywood, LLC, and a portion of the space at the Seminole Tampa Casino to Ark Tampa, LLC. (Answer ¶¶12–13 , ECF No. 52.) Florida assessed a tax on the rent paid to the Seminole Tribe by Ark Hollywood and Ark Tampa for the leases on the Tribe's Reservations. (*Compare* Compl. ¶18, ECF No. 1 *with* Answer ¶18, ECF No. 52.) The Seminole Tribe asserts that Federal law prohibits this Rental Tax. Stranburg disagrees.

Florida imposes a Utility Tax on electricity that is delivered to the Seminole Tribe on tribal reservations. (*Compare* Compl. ¶¶22, 24, ECF No. 1 *with* Answer ¶¶22, 24, ECF No. 52.) The Tribe argues that Federal law prohibits Florida from imposing this tax. Again, Stranburg disagrees.

Previously, this Court determined that the State of Florida is immune from suit under the Eleventh Amendment, but that Stranburg, as executive director of the Florida Department of Revenue, was a proper defendant in this lawsuit.

## 2. Florida's Rental Tax

Florida imposes a Rental Tax on tenants leasing commercial property within the State. *See* Fla. Stat. § 212.013 (2012). The Tribe argues that federal law prohibits Florida from enforcing its Rental Tax against Ark Hollywood and Ark Tampa on their leases of Tribal land. Specifically, the Tribe cites to 25 U.S.C. § 465 and 25 C.F.R. §§ 162.001–162.703 for the proposition that federal law expressly prohibits Florida's Rental Tax. Stranburg argues that "the Rental Tax is not a tax on Tribal land; rather it is a privilege tax imposed on non-Indian tenants for the use of commercial property, and is not prohibited by either provision." (Def.'s Mot. Summ. J. 3, ECF No. 61.) Stranburg also argues that 25 U.S.C. § 465 does not prohibit the State from imposing non-discriminatory taxes to non-Indian leases. (Def.'s Resp. 4, ECF No. 66.) Finally, Stranburg resolutely contends that the Secretary of the Interior (the author of federal regulations in dispute) does not have the authority to create a tax exemption and that the Supreme Court has previously rejected the Secretary's stated rationale in establishing the regulations. (*Id.* 3–8.) This Court finds that federal law prohibits Florida from collecting the Rental Tax from the Ark entities, despite Stranburg's arguments to the contrary.

### A. The Rental Tax is unlawful by virtue of 25 U.S.C. § 465.

The Seminole Tribe's Reservations fall under Section 465's exemption from state taxes. In 1956, Congress conveyed land in Florida to the Seminole Tribe. Act of July 20, 1956, Pub. L. No. 736, 70 Stat. 581 (conveying equitable title to the Seminole Tribe and administrative jurisdiction to the Secretary of the Interior). The Act of July 20, 1956 also declared "all lands which have been acquired by the United States for the Seminole Tribe of Indians in the State of Florida under authority of [the Act of June 18, 1934, Pub. L. No. 383, 48 Stat. 984]" are "a reservation for the use and benefit" of the Seminole Tribe.[1] (*Id.*)

---

[1] The Act of July 20, 1956 refers to "An Act to conserve and develop Indian lands and resources; to extend to Indians the right to form business and other organizations; to establish a credit system for Indians; to grant certain rights of home rule to Indians; to provide for vocational education for Indians; and for other purposes, approved June 18, 1934." The Act of June 18, 1934, Pub. L. No. 383, 48 Stat. 984 was later codified in several sections of the United States Code, including 25 U.S.C. § 465.

Reservation lands acquired by virtue of the Act of June 18, 1934, Pub. L. No. 383, 48 Stat. 984 are "exempt from State and local taxation." 25 U.S.C. 465.

The Supreme Court has interpreted Section 465 as prohibiting a state from imposing a "use tax" on "permanent improvements" that an Indian tribe installs on off-reservation land. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 158 (1973). A *use tax* is a "tax imposed on the use of certain goods that are bought outside the taxing authority's jurisdiction." *Black's Law Dictionary* 1688 (10th ed. 2014). The rationale supporting this rule is that "use is among the bundle of privileges that make up property or ownership of property and, in this sense, at least, a tax upon use is a tax upon the property itself." *Mescalero Apache Tribe v. Jones*, 411 U.S. at 158 (internal quotation marks omitted).

Among the other bundle of privileges that make up property ownership are the right to manage the property and the right to the income from the property. *See Burns v. Pa. Dep't of Corr.*, 544 F.3d 279, 287 (3d Cir. 2008) (citing A.M. Honoré, *Ownership*, in Oxford Essays In Jurisprudence 107 (A.G. Guest, ed. 1961) and Denise R. Johnson, *Reflections on the Bundle of Rights,* 32 Vt. L. Rev. 247, 253 (2007)). The right to manage the property consists of the right to decide who may use the property and how it may be used; the right to the income from the property consists of the right to the benefits derived from allowing others to use the property. Denise R. Johnson, *Reflections on the Bundle of Rights,* 32 Vt. L. Rev. 247, 253 (2007). The right to lease property to another for profit, like use, is among the bundle of privileges that make up property or ownership of property. *See Terrace v. Thompson,* 263 U.S. 197, 215 (1923) (explaining that a property owner's rights includes the right to lease the land). In this sense, a tax upon a lease is a tax upon the property itself. *See Mescalero Apache Tribe v. Jones*, 411 U.S. at 158. Accordingly, this Court finds that Florida's Rental Tax on the Seminole Tribe's lease of reservation land has been prohibited by Congress by virtue of 25 U.S.C. § 465.

**B. The Rental Tax is also preempted by Federal Law and impermissibly interferes with the Tribe's ability to exercise its sovereign functions.**

The Indian Commerce Clause coupled with the semi-autonomous status of Indian tribes prohibits state taxes on non-Indians engaged in commerce on an Indian reservation if (1) the tax is preempted by federal law or, if (2) the tax interferes with a tribe's ability to exercise its sovereign functions. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980); *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of N.M.*, 458 U.S. 832, 837 (1982). While either preemption or interference alone can be a sufficient basis for striking down a state tax, the two barriers are usually analyzed in conjunction with

each other. *See Bracker*, 448 U.S. at 143; *see Ramah Navajo Sch. Bd.*, 458 U.S. at 837.

Current federal regulations expressly prohibit the Rental Tax, as applied to tribal leases. "In the area of Indian affairs, the [President] has long been empowered to promulgate rules and policies, and the power has been given explicitly to the Secretary [of the Interior] and his delegates at the [Bureau of Indian Affairs]." *Morton v. Ruiz*, 415 U.S. 199, 231, 231 n.25 & n.26 (1974) (citing 25 U.S.C. §§ 2 & 9). Consistent with this authority, the Secretary of the Interior promulgated regulations that apply to leases of Indian land entered into under 25 U.S.C. § 415 ("Leases of restricted lands"). One such regulation states that when an Indian tribe leases restricted Indian land to a non-Indian, under 25 U.S.C. § 415, "the leasehold or possessory interest is not subject to any fee, tax, assessment, levy, or other change imposed by any State or political subdivision of a State." 25 C.F.R. § 162.017. In enacting this regulation, the Secretary of the Interior undertook a comprehensive evaluation of existing federal law, both statutory and decisional. The Secretary concluded that "[t]he Federal statutory scheme for Indian leasing is comprehensive, and accordingly precludes State taxation [of Indian leases]." Residential, Bus., & Wind & Solar Res. Leases on Indian Land, 77 Fed. Reg. 72440–01, at *72447–72448 (December 5, 2012).

Neither the Supreme Court, nor the Eleventh Circuit Court of Appeals has directly addressed the question of whether the current federal statutes and regulations governing the leasing of restricted Indian lands (under 25 U.S.C. § 415) have preempted state taxation of such lessees. In the past, the Supreme Court has analyzed the preemption issue regarding the taxing of leases for mining purposes (25 U.S.C. § 396a), and the taxing of fuel used in connection with harvesting of Indian timber (25 U.S.C. §§ 405–407). *Cotton Petrol. Corp. v. New Mexico*, 490 U.S. 163 (1989); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980). In the *Cotton Petroleum* case, the Court found that the state tax was not preempted, while in *Bracker*, the Court found the federal regulatory scheme was so persuasive that it precluded the state from imposing the tax. *Cotton Petrol.*, 490 U.S. at 186; *Bracker*, 448 U.S. at 148.

This Court must give some weight and deference to the new regulations. Unlike in *Cotton Petroleum* or *Bracker*, this Court now has the benefit of the comprehensive analysis performed by the Secretary of the Interior showing how tribal interests are affected by state taxes on leases of restricted Indian land. This is not to say that the Secretary's conclusions are entitled to full *Chevron* deference. They are not. *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001). But, "given the specialized experience and broader investigations and information available to the [Secretary], and given the value of uniformity in its

administrative and judicial understandings of what a national law requires" the Secretary's analysis is entitled "some deference." *Id.* When the relevant history and background of a particular subject are "complex and extensive," courts may give "some weight" to a Secretary's views about the impact of state laws on federal objectives. *Wyeth v. Levine*, 555 U.S. 555, 576 (2009). And there is no dispute that the topic of state taxation of Indian tribes has a complicated history and background. *See, e.g., Washington v. Confed'd Tribes of Colville Indian Res.*, 447 U.S. 134, 176 (1980) (Rehnquist, J concurring in part, concurring in the result in part, and dissenting in part) (explaining that for the past 200 years, the courts of this Nation have struggled to develop "a coherent doctrine by which to measure with some predictability the scope of Indian immunity from state taxation."). "While [Secretaries] have no special authority to pronounce on pre-emption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wyeth*, 555 U.S. at 576-77 (citation & quotation marks omitted). The amount of weight a court should give to a Secretary's "explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness." *Id.* at 577.

The Secretary of the Interior's analysis on the issue of preemption of state taxes on leases of restricted Indian land merits the full amount of deference available under the law. First, the Secretary of the Interior, through the Bureau of Indian affairs, is involved with Indians and Indian tribes on a daily basis. *Cf Bracker*, 448 U.S. at 147. In enacting its new regulations, the Secretary examined this Nation's extensive history with Indian tribes. The Secretary cited case law dating back to the 1800s and several treatises in detailing the historical backdrop of traditional notions of Indian self-government. 77 Fed. Reg. 72440–01, at *72447. The Secretary then painstakingly listed nearly 30 separate aspects of Indian leasing that federal regulations cover. *Id.* Next, the Secretary examined the legislative history of congressional enactments regulating the leasing of restricted Indian lands. *Id.* The Secretary identified multiple federal policies that state taxes would obstruct, including tribal economic development, traditional notions of tribal sovereignty, and territorial autonomy. *Id.* The Secretary also reviewed and cited to a strategy paper on tribal economic development, a 2001 study by the U.S. Department of the Treasury, and a 2006 U.S. Census Report. *Id.* at *72447–72448. Finally, the Secretary detailed the practical reality—a reality that can only be known by an agency that oversees the day-to-day existence of Indians and tribes on reservations across the country—that "the very

possibility of an additional State or local tax has a chilling effect on potential lessees as well as the tribe that as a result might refrain from exercising its own sovereign right to impose a tribal tax to support its infrastructure needs." *Id.* at *72448.

  The Court finds the Secretary's preemption analysis thorough and persuasive. For the reasons detailed by the Secretary of the Interior, this Court finds that the federal regulatory scheme regarding leases of restricted Indian land is so pervasive that it precludes the additional burdens imposed by Florida's Rental Tax. Florida's assessment of its Rental Tax to the leases in this case would obstruct federal policies. The Court concludes that, in these circumstances, 25 U.S.C. § 415 and 25 C.F.R. § 162.017 prohibit the imposition of the Rental Tax to the Ark leases.

  Stranburg argues that the Rental Tax is not a tax on the leasehold or possessory interest of the tribal land, but rather an "excise tax on the privilege of renting or leasing real property." (Def.'s Mot. Summ. J. 6–8, ECF No. 61.) This argument is not persuasive. Section 162.017 reads that a state may not tax the "leasehold or possessory interest" under a lease, nor may it apply "privilege" or "excise" taxes to activities associated with the lease. Stranburg's argument that the Rental Tax is an excise tax on the privilege of renting or leasing real property provides no traction. Even if the Rental Tax is an "excise" or "privilege" tax, it is still impermissible as applied to the Seminole Tribe–Ark leases in this case. 25 C.F.R. § 162.017(b)–(c). Of course, to the extent Stranburg is arguing that the Rental Tax is taxing the Seminole Tribe directly for the privilege of renting the property, the tax would be barred by *Oklahoma Tax Commission v. Chickasaw Nation*, 515 U.S. 450, 458 (1995) as an impermissible direct tax upon the Seminole Tribe for transactions occurring on their Reservations.

  Stranburg next argues that the lease agreements between the Seminole Tribe and Ark Hollywood and Ark Tampa are contrary to 25 C.F.R. § 162.017 because the lease agreements require Ark Hollywood and Ark Tampa to pay the Rental Tax. (Def.'s Mot. Summ. J. 6, ECF No. 61.) Stranburg contends that the Rental Tax must apply to these leases because 25 C.F.R. § 162.008(a) states that "if the provisions of the lease document conflict with this part, the provisions of the lease govern." As the Seminole Tribe points out, Stranburg's argument is flawed for several reasons. First, the lease agreements do not specifically refer to Florida's Rental Tax. (*See* Am. & Restated Lease Agreement § 6.3, ECF Nos. 1–4 & 1–5.) Instead, the lease agreements state in general terms that the Ark entities are responsible for paying all applicable taxes on the leased property. (*Id.*) Since the Rental Tax is unlawful, as applied to these leases, it is not applicable to this property. In other words, there is no conflict

between the lease agreements and 25 C.F.R. § 162.017. The language of the lease agreements cannot be read to require the Ark entities to pay unlawfully imposed taxes. The second problem with this argument is that, even if the language of the lease agreements was in conflict with 25 C.F.R. § 162.017, the lease agreement is a contract between the Seminole Tribe and the Ark entities—it conveys no rights upon Stranburg to enforce an otherwise unlawful tax. The law requires a party to "assert his *own* legal rights and interests," and not to rely on "the legal rights or interests of third parties." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 984 (11th Cir. 2005). And the lease agreements expressly disclaim that the terms of the agreements convey third-party-beneficiary rights to anyone. (Am. & Restated Lease Agreement § 22.15, ECF Nos. 1–4 & 1–5.) Stranburg has not offered any legal authority to the contrary.

Stranburg also argues that the case of *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1989), requires this Court to uphold the Rental Tax. This argument is not convincing because there are several material differences between the Rental tax at issue here, and the state taxes that were challenged in the *Cotton Petroleum* case. First, in *Cotton Petroleum* the challengers of the tax were relying on a single sentence contained in a letter from the Secretary of the Interior to Congress regarding proposed legislation. *Cotton Petrol.*, 490 U.S. at 177–78. In contrast, here, the Seminole Tribe has offered the detailed and comprehensive analysis from the Secretary of the Interior. This case does not involve a solitary sentence in a missive, but instead a comprehensive set of regulations "addressing non-agricultural surface leasing of Indian land." 77 Fed. Reg. 72440-01, at *72440. This case does not involve the unilateral view of the Secretary of the Interior speaking to the legislature, but instead a set of collaborative regulations enacted through the regular notice-and-comment rulemaking process.

The second material difference between the Rental tax and the oil-and-gas-severance tax challenged in the *Cotton Petroleum* case is that in *Cotton Petroleum* the Court found that the "legislative background" and "relevant backdrop of tribal independence" revealed that Congress had expressly permitted states to tax oil-and-gas production on Indian land on several occasions in the past. *Cotton Petrol.*, 490 U.S. at 180–82. There is no similar Congressional history expressly permitting states to tax non-agricultural surface leasing of Indian land. Stranburg has not cited to any such laws, nor has he argued that such a legislative history exists. In this case then, the relevant backdrop of tribal independence is the "deeply rooted" historical "policy of leaving Indians free from state jurisdiction and control." *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 168 (1973) (quoting *Rice v. Olson*, 324 U.S. 786, 789 (1945)). In this case, where there is no Congressional

history of allowing states to tax non-agricultural surface leasing of Indian land, the Court must resolve these "ambiguities in federal law . . . in favor of tribal independence." *Cotton Petrol.*, 490 U.S. at 177.  Because the facts and tax in this case are so different from those in the *Cotton Petroleum* case, the Court is not persuaded by Stranburg's arguments that this Court should reach the same result as the Court in *Cotton Petroleum*.

Finally, Stranburg argues that the Court should uphold the Rental Tax because the Seminole Tribe has not presented adequate evidence that the Rental Tax imposes an economic burden on the Tribe.  (Def.'s Mot. Summ. J. 10–11, ECF No. 61.)  This argument also fails for several reasons.  First, the *Bracker* case does not require a finding that a state's tax imposes an economic burden upon a Tribe.  The Supreme Court explained that its analysis and decision was not based on the economic burden of the tax falling upon the Tribe—rather, the Court struck the tax because federal law preempted it. *Bracker*, 448 U.S. at 151 n.15.  Even if such an economic burden were required, the Court in *Bracker* accepted the proposition that the state tax, although imposed on non-Indians engaged in activities on the reservation, affected the amount of revenue available to the Tribe. *Id.* at 150.  Of course, this is nothing more than an acknowledgment of the law of scarcity—a fundamental concept of economics. *See* Paul A. Samuelson & William D. Nordhaus, Economics 333 (James A. Bittker, *et al.* eds., 14th ed. 1992) ("At the very core of economics lies the fact of scarcity.").  If Florida's Rental Tax does not apply, an entity leasing tribal land will have additional money in its pocket—money that would then be available to the Tribe, either through negotiated higher rent or through a tribal tax.

In conclusion, the Court finds that federal law preempts the application of the Rental Tax to the Tribe's leases with the Ark entities.  The Secretary of the Interior's new regulations have changed the landscape of this area of the law, specifically regarding the issue of preemption.  To ignore these regulations would be contrary to well-established precedent.

### 3. Florida's Utility Tax

Florida's Utility Tax is "imposed on gross receipts from utility services that are delivered to a retail consumer." Fla. Stat. § 203.01(1)(a)(1) (2012). The Seminole Tribe asks this Court to declare that "utility services provided to the Tribe on Tribal Land are not subject to [Florida's] Utilities Tax;" and to prevent "further imposition or collection of [the] Utilities Tax on utility services provided to the Tribe on Tribal Land." (Compl. 1–2, ECF No. 1.)

A state may not directly tax an Indian Tribe on an Indian reservation unless a federal statute expressly permits the tax. *Okla. Tax Comm'n v.*

*Chickasaw Nation*, 515 U.S. 450, 458 (1995). "If the legal incidence of an excise tax rests on a tribe . . . for sales made inside Indian country, the tax cannot be enforced." *Id.* at 459. Florida's utility tax is an excise tax. *Cf. Heriot v. City of Pensacola*, 146 So. 654, 655 (Fla. 1933) (holding that a tax on the purchase of electricity is "clearly an excise tax"). So the dispositive question on this issue is whether the legal incidence of Florida's Utility Tax falls upon the Seminole Tribe or upon the utility company. This Court finds that it rests upon the Tribe.

### A. The Concept of Legal Incidence.

The *incidence* of a tax refers to who pays the tax. *See* Paul A. Samuelson & William D. Nordhaus, Economics 333 (James A. Bittker, *et al.* eds., 14th ed. 1992); *see also Dictionary.com Unabridged*. Random House, Inc. http://dictionary.reference.com/browse/incidence (accessed: August 22, 2014) (defining *incidence* as "falling upon, affecting, or befalling."). Economists distinguish between the *economic incidence* of a tax and its *statutory incidence*. George R. Zodrow, Incidence of Taxes, in The Encyclopedia of Taxation and Tax Policy 168–72 (Joseph J. Cordes *et al.* eds., 1999). The distinction accepts the reality that just because a legislature enacts a statute requiring *A* to pay a certain tax doesn't mean that *A* will ultimately bear the full impact of the tax because *A* will likely pass the burden of the tax onto *B*. *Id.* at 169. "Businesses may be able to shift the tax 'forward' onto their customers by raising their price by the amount of the tax." Samuelson & Nordhaus, *supra*. Discerning the actual economic incidence of a tax is an extremely complicated and controversial undertaking. *See generally* 4 Don Fullerton & Gilbert E. Metcalf, Handbook of Public Economics Ch. 26, (A.J. Auerbach, *et al.* eds., 2002).

Some legal questions require a court to decide who bears the incidence of a particular tax. *See, e.g.*, *First Agric. Nat'l Bank of Berkshire Cnty. v. State Tax Comm'n*, 392 U.S. 339, 346–47 (1968) ("And essentially the question for us is: On whom does the incidence of the tax fall?"). Since the law requires predictability and certainty, when faced with this question courts look only to the statutory—or legal—incidence of the tax. *See Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. at 459–60 ("If we were to make 'economic reality' our guide, we might be obliged to consider, for example, how completely retailers can pass along tax increases without sacrificing sales volume—a complicated matter dependent on the characteristics of the market for the relevant product."); *cf. also* Laurence H. Tribe, *Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism*, 89 Harv. L. Rev. 682, 713 n.104 (1976) ("The

legal incidence test might be said to focus on who is 'hit' rather than on who is 'hurt.'").

### B. The legal incidence of Florida's Utility Tax impermissibly falls upon the Seminole Tribe.

If a statute does not "expressly identify who bears the tax's legal incidence" a court must make a "fair interpretation of the taxing statute as written and applied." *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. at 461.

Both the language and structure of Florida's Utility Tax reveal that its legal incidence falls upon the consumer, not the utility company. Florida's Utility Tax is "imposed on gross receipts from utility services that are delivered to a retail consumer." Fla. Stat. § 203.01(1)(a)(1) (2012). Every consumer is required to "remit the tax" to the utility company as a part of the total bill. Fla. Stat. § 203.01(4). The utility company then pays the taxes to the Florida Department of Revenue on a monthly basis. Fla. Admin. Code R. 12B–6.005(1)(a). Although a utility company may separately itemize the tax on a consumer's bill, the consumer is still required to "remit the tax" to the utility company and the utility company is still responsible for collecting the tax and paying the State. *See* Fla. Stat. § 203.01(4) & (5).

If the consumer does not remit the tax to the utility company, then the utility company is not required to pay the tax over to the State. Fla. Admin. Code R. 12B–6.005(1)(e)(2) & (3); (Steffens Dep. 37:20–38:11, Nov. 13, 2013, ECF No. 63-1). A utility company may deduct uncollected taxes from future payments to the Florida Department of Revenue. Fla. Admin. Code R. 12B–6.005(1)(e)(2) ("[The utility company] may take a credit for net uncollectables for which gross receipts tax has been previously paid to the Department."). In other words, the utility company is no more than a transmittal agent for the tax imposed on the consumer of the utility. This scenario is identical to the tax analyzed by the Supreme Court in *Oklahoma Tax Commission v. Chickasaw Nation*, where the Court determined the legal incidence was not on the transmittal agent, but rather on the person paying the tax to the transmittal agent. 515 U.S. at 461–62 (explaining that since "the distributor may deduct the uncollected amount [of taxes] from its future payments to the Tax Commission," the distributor was "no more than a transmittal agent for the taxes imposed on the retailer"). Stranburg argues that the utility company is ultimately "fully and completely liable for the tax," and thus the legal incidence falls upon the utility company. (Def.'s Mot. Summ. J. 12, ECF No. 61.) But in reality, the utility company is only liable for the tax if and when the consumer remits the tax to the utility company as a part of the consumer's utility bill.

(Steffens Dep. 30:17–24, 38:5–11, ECF No. 63-1); Fla. Admin. Code R. 12B–6.005(1)(e)(2).

The way the Utility Tax addresses exemptions and exceptions reveals the legal incidence of the tax is upon consumer. The Utility Tax has several provisions relating to exemptions based on the identity of the consumer. For example, certain consumers who are engaged in industrial operations are exempt from paying the Utility Tax when purchasing natural gas. *See* Fla. Stat. § 203.01(3)(d). If it turns out that the consumer was not entitled to the exemption, the Department of Revenue will look to collect the tax directly from the consumer, not the utility company. *Id.* Although this subsection of the Utility Tax is not the subject of the Tribe's complaint, the provisions of the statute must be read as a whole. Another example regarding exemptions is found in another statute within the same Chapter. In that statute, the Florida legislature expressly stated that no other "exemptions or exceptions" apply to the Utility Tax. Fla. Stat. § 203.04. The fact that the Florida legislature provided some exemptions to the Utility Tax, and disavowed many other exemptions, reveals that the legislature intended the legal incidence of the Utility Tax to fall upon consumers. If the legal incidence of the tax were on the utility company, there would be no need for the disavowal of most exemptions and exceptions, or the inclusion of others. Stranburg argues that the legal incidence of the tax falls upon the utility company because even governmental units that would otherwise be exempt from taxation are obligated to pay the Utility Tax. (Def.'s Mot. Summ. J. 13, ECF No. 61.) This argument is unconvincing. The Florida legislature has the authority to waive the State's usual tax immunity by statute. *Cf. Dickinson v. City of Tallahassee*, 325 So. 2d 1, 3 (Fla. 1975). It has expressly done so in enacting the Utility Tax.

Another feature of the Utility Tax reveals that its legal incidence is on the consumer. The Utility Tax only applies to sales to consumers, but not to sales between utility companies. *See* Fla. Admin. Code R. 12B–6.0015(2)(c). Again, this is identical to the tax considered by the Supreme Court in *Oklahoma Tax Commission v. Chickasaw Nation*. 515 U.S. at 461. In that case, the Court found that the legal incidence of a tax that applied to sales by distributors to retailers but not to sales between distributors, fell upon the retailers. In this case, Florida's Utility Tax applies to sales by utility companies to consumers, but does not apply to sales between utility companies. Consequently, it is apparent that the legal incidence of Florida's Utility Tax is upon the consumer.

The Florida Utility Tax is different from the tax considered by the Supreme Court in *Wagon v. Prairie Band Potawatomi Nation*, 546 U.S. 95 (2005). In *Wagon*, the Kansas tax permitted distributors "to pass along the cost of the tax to downstream purchasers" but did not require them to do so.

*Wagon*, 546 U.S. at 103. The Florida Utility Tax does not give utility companies the option to choose between passing the tax downstream to consumers or not. Although Stranburg argues that the utility-tax statute "does not require the tax to be passed on to the purchaser," he provides no citation for that proposition—and the language and application of the Utility Tax are completely contrary to that statement. (Def.'s Opp'n Br. 13, ECF No. 66.) Under the structure and application of the Utility Tax, the tax is automatically applied to, and collected from, consumers. Stranburg's argument that a utility company may itemize the tax on a consumer's bill, or not, misses the point. The fact that the tax may be separately itemized or not, is not the same as saying that the tax may be passed on or not. Under Florida law, the tax **is** passed on to consumers, whether it is separately itemized or not—the two concepts are not related in the way that Stranburg has argued.

Another key difference between the Florida Utility Tax and the Kansas fuel tax in *Wagon* is that a fuel distributor owed the Kansas tax even if it never delivered the fuel to a consumer. *Wagon*, 546 U.S. at 108–09, 109 n.4 ("[A] distributor must pay the tax even if the fuel is *never* delivered."). The fact that a fuel distributor was liable to the state for the fuel tax even if the fuel was never delivered to a consumer supports the Court's conclusion that the legal incidence of the tax was on the distributor (not the consumer). By contrast, in Florida, a utility company does not pay the Utility Tax on electricity that is never delivered to a consumer. Fla. Admin. Code R. 12B–6.0015(2)(c)(4). The fact that the Utility Tax is not owed unless and until it is actually delivered to a consumer, supports this Court's conclusion that the legal incidence of the Utility Tax is on the consumer (not the utility company).

Florida's Utility Tax is similar to the tax considered by the Supreme Court in *United States v. State Tax Commission of Mississippi*, 421 U.S. 599 (1975). In that case, the Court examined a tax scheme that required suppliers to collect the tax from the consumer and remit it to the State. *State Tax Comm'n of Mississippi*, 421 U.S. at 608. The Court explained that the legal incidence of a tax falls on the consumer when a state requires the tax to be passed on to the consumer, collected by the seller, and then paid over to the state. *Id.* That is precisely how Florida has structured its Utility Tax. The Utility Tax is automatically imposed upon the consumer, collected by the utility company, and paid over to the Florida Department of Revenue. An example provided by Stranburg makes the point: If a consumer pays only half of a $100 utility bill, 2.5% of the consumer's $50 payment is automatically allocated to the State for the Utility Tax—but not 2.5% of the full $100 utility bill. (Def.'s Opp'n Br. 12, ECF No. 66 (citing Steffens Dep. 30:17–24, ECF No. 63-1).) There could never be a situation where the utility company could be

responsible to the State for the Utility Tax unless it collected the tax from the consumer. (*See* Steffens Dep. 38:5–11.) The structure and application of the Utility Tax unavoidably requires that the utility company pass on the tax to consumers. Consequently, the legal incidence of the Florida Utility Tax falls upon the consumer. *See State Tax Comm'n of Mississippi*, 421 U.S. at 608–09 ("The Tax Commission clearly intended—indeed, the scheme unavoidably requires—that the out-of-state distillers and suppliers pass on the markup to the military purchasers.").

Stranburg argues that the legal incidence of the Utility Tax falls upon the utility company because the statute states that the "tax is imposed . . . for the privilege of conducting a utility . . . business." Fla. Stat. § 203.01(4). Stranburg's rationale is that since the tax is on the privilege of conducting a utility business, the legal incidence of the tax must be upon the utility company as the entity exercising the privilege. This argument is not persuasive. As the Seminole Tribe points out, Florida's sales tax taxes the "privilege . . . of selling tangible personal property at retail in this state," but that tax's legal incidence falls upon the consumer, not on the retailer who is exercising the privilege. *Fla. Dep't Revenue v. Naval Aviation Museum Found., Inc.*, 907 So. 2d 586, 587 (Fla. 1st DCA 2005). Under Florida's sales tax statute, the legal incidence of the tax falls upon the consumer, even though the retailer is obligated to collect the tax and "ultimately pay the state sales tax." *Id.* The retailer "must add the amount of the tax to the sale price and separately state the amount, which then becomes part of the price of the sale." *Id.* Under the Florida Utility Tax, the tax is automatically included in, and becomes part of, the utility bill, though it may be separately stated. *See* Fla. Stat. § 203.01 (4). Although there are some differences between the statutory language of the two statutes, the structure, application, and result of both taxes is the same: The legal incidence falls upon the consumer, the seller collects the tax and pays it to the State. In both instances, although the statute purports to tax the privilege of engaging in the business, the structure and application of the taxes reveal that the legal incidence of the taxes is upon the consumer. Of course, Stranburg's argument here would also invalidate the Rental Tax since that tax is imposed on the "privilege" of renting or leasing commercial property within the State. Fla. Stat. § 212.031(1)(a); *see also Fla. Revenue Comm'n v. Maas Bros., Inc.*, 226 So. 2d 849, 852 (Fla. 1st DCA 1969) ("It follows, since it is the landlord and not the tenant who engaged in the business, that the tax was intended to be imposed on the landlord.").

The Utility Tax arises when the utility is provided to the Seminole Tribe on its Reservation. Stranburg argues that "[t]he tax obligation arises when the utility company receives payments from its retail consumers for utility services,

which occurs outside the reservation." (Def.'s Mot. Summ. J. 15, ECF No. 61.) Based on this statement, Stranburg reasons that the rule of *Chickasaw Nation* should not apply here, but that the Utility Tax should be analyzed under a completely different framework applicable when a state taxes an Indian tribe outside of a reservation. (*Id.*) Stranburg offers no legal citation for the proposition that the tax obligation of a utility tax arises when the utility company receives payment for the service. "The premise of our adversarial system is that . . . courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan,* 714 F.2d 171, 177 (D.C. Cir. 1983). When parties do not fully develop their arguments and support them with citation to legal authority, the burden upon the Court is improperly increased. "[T]he onus is upon the parties to formulate arguments." *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995). Generally, a "litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him." *Phillips v. Hillcrest Medical Center,* 244 F.3d 790, 800 n.10 (10th Cir. 2001) (internal quotation omitted); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (internal quotation omitted)). The Court finds that Stranburg has forfeited this argument by failing to develop it sufficiently. In any event, Seminole Tribe has cited to authority standing for the proposition that the tax obligation of a service tax arises where the service is delivered. *Cf. Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of N.M.*, 458 U.S. 832, 844 (1982) (construing a gross receipts tax on construction services as being imposed on tribal lands where the construction was taking place). Stranburg's skeletal argument—that the tax obligation arises when the utility company receives payment since the utility company is not liable to pay the tax to the State until it collects it from the consumer—is flawed. The tax is a debt of the consumer, owed to the utility company (to be forwarded to the State upon collection). Fla. Stat. § 203.01(4). As a result, the tax obligation (*i.e.*, the debt) arises when the utility company provides utility services to the consumer.

In conclusion, the fairest reading of Florida's utility-tax scheme as a whole is that the legal incidence of the tax falls upon the consumer. The utility-tax scheme unavoidably requires utility companies to include the tax in their bill to consumers (whether separately stated or not). The scheme requires utility companies to collect the tax from consumers and then to deliver the tax

to the Department of Revenue. Although the utility-tax statute does not contain express language requiring a utility company to pass on and collect the tax from consumers, the Supreme Court has never required that "pass-through provisions or collections requirements be explicitly stated." *Cal. State Bd. of Equalization v. Chemehuevi Indian Tribe*, 474 U.S. 9, 11 (1985).

Since the Court has concluded that Florida's Utility Tax is an impermissible direct tax upon the Seminole Tribe on its reservation, the Court need not address the Tribe's alternative arguments that the tax is impermissible under a *Bracker* preemption analysis, or that the Tribe may challenge the tax as an assignee of the utility company.

### 4. Conclusion

This Court finds that federal law prohibits Florida from collecting the Rental Tax from the Ark entities for their leases of reservation land. The Court further finds that federal law preempts the application of the Rental Tax to the Tribe's leases with the Ark entities. The Court also finds that federal law prohibits Florida from collecting the Utility Tax from the Tribe since the legal incidence of the Utility Tax falls on the Seminole Tribe.

Consistent with these findings, the Court **grants** the Seminole Tribe's Motion for Summary Judgment (ECF No. 59), **denies** Stranburg's Motion for Summary Judgment (ECF No. 61). The Court will set out its judgment in a separate document as required by Federal Rule of Civil Procedure 58. The Order resolves all of the issues in this matter. The Court directs the Clerk to **close** this case.

**Done and ordered**, in chambers, at Miami, Florida, on September 5, 2014.

Robert N. Scola, Jr.
United States District Judge